UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO.: 1:09-CV-00031-TBR

**MELISSA GAYLE SIMPSON**
*as Personal Representative of the*
*Estate of Charles David Fancher*,                                                      PLAINTIFF

v.

**KEVIN THOMPSON, et al.**                                                               DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion for Summary Judgment. DN 29. Plaintiff has filed a response. DN 31. Defendant has filed a reply. DN 36. This matter is now ripe for adjudication. For the following reasons, Defendant's motion is GRANTED in part and DENIED in part. All remaining claims are DISMISSED WITHOUT PREJUDICE.

## BACKGROUND

On March 10, 2007, Charles David Fancher was at a friend's house with his children. DN 29, Ex. 4, 'Dep. Melissa Simpson.' At some point, the eldest child observed Mr. Fancher drinking 'red kool-aid' which the child suspected was alcoholic. *Id.* The child called her mother, Melissa Gayle Simpson, Mr. Fancher's ex-wife, to pick them up. *Id.* While picking up the children, Ms. Simpson observed that Mr. Fancher appeared to be under the influence of alcohol. *Id.* As she drove away, Ms. Simpson's children expressed concern that Mr. Fancher was in a fight with the friend that owned the home they were visiting. *Id.* As she was driving away, Ms. Simpson saw Deputy Sheriffs Kevin Thompson and Scott Gordon, two of the defendants, at a gas station. *Id.* She reported everything to the Deputies, and they agreed to look into the incident. *Id.*

After arriving at the scene, the Deputies met the owner of the home in which Mr. Fancher was located. The owner advised the Deputies that he did not want Mr. Fancher in his home. The

Deputies entered the home and tried to convince Mr. Fancher to leave. When he refused, the Deputies placed Mr. Fancher under arrest. As they were leaving the home, Mr. Fancher allegedly went limp, as he often did during his arrests, and the Deputies were forced to carry him from the home. After being removed from the home, Mr. Fancher allegedly began to struggle and pull away from the officers. At some point, the Deputies handcuffed Mr. Fancher's hands behind his back. Throughout this process, Mr. Fancher was allegedly being verbally abusive towards the Deputies.

Because there is no jail in Metcalfe County, where the arrest took place, Mr. Fancher needed to be transported to a neighboring county. The Deputies called dispatch requesting a transport to the jail. Jailor Jimmy Shive, a third defendant, responded to the call. Upon arriving at the scene, Jailor Shive provided the Deputies with a pair of leg shackles, which they used to shackle Mr. Fancher's legs. The Deputies tried to question Mr. Fancher about the amount of alcohol and drugs he had consumed, but were met with obscenities. To the deputies, this indicated that Mr. Fancher was at his normal level of intoxication. Due to his lengthy arrest record, the Deputies and Jailor Shive were aware that Mr. Fancher would kick at the doors, windows, and safety cage of the transport car while he was en route to jail. Accordingly, two additional pairs of handcuffs were connected to each other and then connected between the shackles on Mr. Fancher's legs and the handcuffs on his wrists. Mr. Fancher was then place on his belly in the rear seat of the transport car. After Deputy Thompson checked Mr. Fancher's breathing, Jailor Shive left with Mr. Fancher.

From the arrest scene to the jail was a 15 to 20 minute drive. Jailor Shive enquired into Mr. Fancher's well being on multiple occasions, and was met with continued obscenities. Jailor Shive last spoke to Mr. Fancher 3-4 miles out from the jail. Jailor Shive stated that driving the last 3-4 miles probably took 5 to 7 minutes. Upon arriving at the jail, Jailor Shive went to the back seat to remove Mr. Fancher. At that time, Jailor Shive noticed that Mr. Fancher had some discoloration in

his face. Jailor Shive called for help and removed the cuffs and shackles. Prison officials started life saving measure, and an ambulance was called. Mr. Fancher was pronounced dead later that evening at the hospital.

An autopsy by the medical examiner found a blood alcohol content of .337-.341. The autopsy also revealed .15 milligrams of Diazepam (Valium) per liter of blood. The medical examiner concluded that both of these substances would work together to suppress the central nervous system and other functions. Accordingly, the medical examiner ruled the cause of death to be an overdose of alcohol and Diazepam resulting in heart and lung failure.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary

judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

The Motion for Summary Judgment covers a number of issues. First, Plaintiff has brought a number of 42 U.S.C. § 1983 claims against Defendants. Defendants first argue that the § 1983 claims are only brought against Defendants in their official capacity and must accordingly be judged under the municipal liability standard. In the alternative, Defendants argue that even if this Court determines that Defendants were also named in their individual capacities, all Defendants are entitled to qualified immunity. Second, Plaintiff has brought state law claims against Defendants. For the state law claims, Defendants argue they are entitled to absolute sovereign immunity.

## 42 U.S.C. § 1983

### I. Official Capacity Claims

A suit against a person in their official capacity is "a right to recover damages from" the entity that employee represents. *Brandon v. Holt*, 469 U.S. 464, 471 (1985). Accordingly, "[t]here is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985). Since Plaintiff sued Metcalfe County directly, there is no need to consider the official capacity claims against the individual defendants. *Petty v. County of Franklin, Ohio*, 478 F.3d 341, 349 (6th Cir. 2007); *Garrett v. Unified Gov't of Athens-Clarke Cnty.*, 246 F.Supp.2d. 1262, 1271 (M.D.Ga. 2003).

A state is immune from suit for money damages under the Eleventh Amendment. However, this protection does not extend to counties. *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890).

"Municipalities are not . . . liable for every misdeed of their employees and agents." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993). Rather, if "execution of a government's policy or custom . . . inflicts the injury" than "the government entity is responsible under § 1983." *Id.* (citing *Monell v. New York Dept. Of Social Services*, 436 U.S. 658, 694 (1978)). To satisfy this requirement, the Sixth Circuit requires a plaintiff to "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Id.* at 364 (internal citations omitted).

It seems undisputed that there was no applicable written policy. Testimony of both Deputy Thompson and Jailor Shive established that there were no written policies in place regarding the restraint method used on Mr. Fancher. Accordingly, Plaintiff is required to show an unconstitional 'custom' under *Monell*. In addition, the custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Holder v. Lawson*, No. 3:10-cv-P512-H, 2010 WL 3277131, at *2 (W.D.Ky Aug. 17, 2010) (citing *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994)). In the complaint, Plaintiff alleges no unconstitutional policy or custom. Similarly, Plaintiff has failed to connect any policy or custom to Metcalfe County itself. Rather, it seems that the individual defendants, based on the circumstances they were confronted with, chose to employ the restraint method used on Mr. Fancher. Accordingly, for the § 1983 claims, the Motion for Summary Judgment is GRANTED with respect to Metcalfe County and all individual defendants in their official capacities. *See Sanchez-Orozco v. Livonia Police Dept.*, No. 2:08-cv-14297, 2009 WL 2922041(E.D.Mich. Sept 8, 2009) (granting a motion to dismiss when no policy or custom identified in the pleadings); *Petty*, 478 F.3d at 249 (same).

## II. Determining Whether Defendants are Named Individually

Before determining whether official immunity applies in the instant case, this Court must

first determine if any defendants are even named in their individual capacity. Defendants, relying on *Calvert Investments, Inc. v. Louisville & Jefferson Co. Metro. Sewer Dist.*, 805 S.W.2d 133 (Ky. 1991), claim that, since the face of the complaint names Defendants only in their official capacity and the pleadings similarly reinforce that, Defendants are named only in their official capacities. Plaintiff contends, relying on *McCollum v. Garrett*, 880 S.W.2d 530 (Ky. 1994), that result would be incorrect. However, for purposes of § 1983, this Court must be guided by federal law when determining the capacity of the suit rather than Kentucky law. *See Stewart Org., Inc. v. Ricoh Corp*, 487 U.S. 22, 26 n. 3 (1988) ("[T]he presence of a federal-question could cut only in favor of the application of federal law.").

"The distinction between official-capacity suits and personal-capacity suits is more than a mere pleading device." *Hafer v. Melo*, 502 U.S. 21, 27 (1991) (internal quotation omitted). However, the Sixth Circuit has stated that a plaintiff "seeking damages under § 1983 set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials." *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989). While this holding seems to have been drawn into question by the subsequent *Hafer* case, the Sixth Circuit has reaffirmed *Wells* since the *Hafer* decision. *See*, *e.g.*, *Moore v. City of Harriman*, 272 F.3d 769 (6th Cir. 2001). However, the holding in *Wells* has been clarified as requiring "a § 1983 complaint" to "afford the defendant fair notice of what the claim is and the grounds upon which it rests." *Id.* at 772. The Sixth Circuit has never "applied such a strict interpretation" as to require "plaintiffs to affirmatively plead 'individual capacity.'" *Id.* Accordingly, a court should apply a "course of proceedings" test "to determine whether § 1983 defendants have received notice of the plaintiff's intent to hold them personally liable[.]" *Id.* As a result, "plaintiffs must clearly notify defendants of the potential for individual liability[.]" *Id.* at 773. Applying the various factors

discussed by the Sixth Circuit, it would be a close call in this case as to whether Defendants were sued in their individual capacities. However, this Court does not need to reach that issue. Similar to *Moore*, Defendants in this case meet all the requirements to fulfill Fed. R. Civ. P. Rule 15(c). The official and individual capacity claims in this case clearly arise from the same "conduct, transaction, or occurrence[.]" Rule 15(c)(2). Defendants were served within 120 days. Rule 15(c)(3). Finally, given the inclusion of state law claims, the officers had some notice that they might be liable individually. Accordingly, regardless of whether the original complaint taken in conjunction with the course of proceedings would result in the Defendants being sued in their individual capacity, any amended complaint would relate back to the original complaint under Rule 15(c) and could, on its face, name Defendants individually.

### III. Individual Capacity Claims

The Supreme Court mandates "a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 123 S.Ct. 808, 815 (2009).

> "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right . . . [s]econd, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct."

*Id.* at 815-16. While a court was originally mandated to evaluate the steps in numerical order, the Supreme Court recently stated that "the judges of district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of qualified immunity analysis should be addressed first[.]" *Id.* at 818. In the instant case, Plaintiff has alleged constitutional violations as a result of deliberate indifference to medical needs and excessive force during an arrest.

### A. Deliberate Indifference

As its jurisprudence has evolved, the Supreme Court has stated that the Eighth

Amendment encompasses "the evolving standards of decency that mark the progress of a maturing society" and "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotations omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* Failure to provide medical care could produce pain and suffering, physical torture or a lingering death "inconsistent with contemporary standards of decency[.]" *Id.* Accordingly, the "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

However, an "inadvertent failure to provide adequate medical care" or a "negligent [diagnoses or treatment]" does not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.* at 104-05. Similarly, a dispute over the adequacy of treatment also does not generally result in a constitutional violation. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Rather, an inmate must be "exposed to undo suffering or the threat of tangible residual injury." *Id.*

In the current case, it is undisputed that Mr. Fancher never requested medical care. When observing Mr. Fancher, the officers felt that his level of intoxication was the same as it normally was. When asked about his consumption of alcohol and drugs that evening, Mr. Fancher refused to respond. During transportation to the jail, Jailor Shive attempted to interact with Mr. Fancher to ensure that he was still responsive, and was met with obscenities. Accordingly, there is no evidence of deliberate indifference in the current case and no Eighth Amendment violation.

**B. Excessive Force**

"Use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overruled on other grounds). To determine if the constitutional violation was clearly established, a court must decide if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Plaintiffs do not dispute that Mr. Fancher had been arrested on multiple previous occasions. Plaintiffs do not dispute that on previous occasions when Mr. Fancher was arrested while heavily intoxicated, he kicked at the cage, windows, and doors of the police cruiser while being transported to the county jail. Plaintiffs do not dispute that, given Mr. Fancher's past behavior, some method of restraining Mr. Fancher's legs was necessary for the protection of police property and the safety of the transporting officer. Given all of the undisputed facts above, Defendant police officers did not use an unreasonable amount of force under objective standards of reasonableness. Rather, Defendants' actions were "within the bounds of appropriate police responses." *Id.* at 208.

Alternatively, there is no evidence that any alleged excessive force would have violated a clearly established right. There is no Supreme Court or Sixth Circuit precedent decrying the use of the restraint method employed by the officers. While some Circuits have questioned the constitutionality of the aforementioned restraint method, other have found it constitutionally valid. *Compare Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274 (11th Cir. 2004); *Mayard v. Hopwood*, 105 F.2d 1266 (8th Cir. 1997) *with Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001). The lack of precedent from either the Supreme Court or the Sixth Circuit, combined with the split of authority over the restraint method used by the officers qualifying as excessive force, requires a finding that no constitutional right was clearly established.

## STATE LAW CLAIMS

Defendants state that Summary Judgment is appropriate for any state law claims because a state enjoy absolute Sovereign/Governmental Immunity in its own courts. Plaintiff contends that Sovereign Immunity was abrogated by the Kentucky Legislature, making Kentucky amenable to suit. In addition, Plaintiff claims that Defendants were sued in their individual capacity and are not eligible for Sovereign Immunity.

KRS 70.040 waives "the sheriff's official immunity . . . for the tortuous acts or omissions of his deputies." *Jones v. Cross*, 260 S.W.3d 343, 346 (Ky. 2008). Accordingly, this Court cannot currently grant summary judgment on the state law claims. Given that this Court has granted summary judgment on all federal claims, this Court lacks Federal Question jurisdiction. Since there is no diversity of citizenship, this Court lacks subject matter jurisdiction to adjudicate state law claims. *Ruhgras AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). Accordingly, the remaining claims are DISMISSED WITHOUT PREJUDICE. *Curry v. U.S. Bulk Transport, Inc.*, 462 F.3d 536, 539-40 (6th Cir. 2006). To take advantage of the filing date of this complaint, Plaintiff must commence a new action in state court "within ninety (90) days" from the time of judgment. KRS § 413.270

## CONCLUSION

This Court has GRANTED summary judgment on Plaintiff's § 1983 claims. Those claims served as the only basis for the Federal Question jurisdiction claimed by Plaintiffs. Since there is plainly no diversity of citizenship, this Court lacks subject-matter jurisdiction and must DISMISS WITHOUT PREJUDICE this case sua sponte. Fed. R. Civ. P. 12(h)(3); *Owens v. Brock*, 860 F.2d 1363, 1367 (6th Cir. 1988).